E-FILED
Monday, 06 April, 2020  11:45:17 AM
Clerk, U.S. District Court, ILCD

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Central District of Illinois

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with the Facebook User ID 100003008396377 (Philly Mills) more particularly described on Attachment A

Case No. 20-MJ-7061

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Information associated with the Facebook User ID 100003008396377 (Philly Mills) more particularly described on Attachment A, which is attached hereto and incorported herein by reference,

located in the _____Central_____ District of _____Illinois_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1344 | Bank fraud |
| 18 U.S.C. 1343 | Wire fraud |

The application is based on these facts:
See Affidavit of FDIC Special Agent Jason P. Lebeau.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Jason P. Lebeau

*Applicant's signature*

Jason P. Lebeau, Special Agent, FDIC

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____electronic mail and telephone_____ *(specify reliable electronic means).* s/Eric I. Long

Date:  April 6, 2020

*Judge's signature*

City and state:  Monticello, IL

Eric I. Long, U.S. Magistrate Judge

*Printed name and title*

## **AFFIDAVIT**

I, JASON P. LEBEAU, being duly sworn on oath, depose and state as follows:

## **INTRODUCTION**

1.      I am a Special Agent with the Federal Deposit Insurance Corporation-Office of Inspector General (FDIC-OIG). I have been a Special Agent with FDIC-OIG from April 2014 until present, where my responsibilities include the investigations of various financial crimes of Title 18 of the United States Code, such as violations of bank fraud, wire fraud, mail fraud, and similar offenses. Prior to this employment, I was a Special Agent with IRS-Criminal Investigation from October 2001 until April 2014, where my responsibilities also included the investigation of financial crimes, such as criminal violations of the Internal Revenue Code, Title 26, United States Code (violations of tax law), Title 31, United States Code (violations of currency reporting requirements), and related offenses of Title 18, United States Code (including money laundering violations). Throughout my career as a Special Agent, I have participated in numerous federal investigations involving bank fraud violations, wire fraud violations, financial reporting fraud violations, money laundering violations, and tax violations.

2.      I am a Certified Public Accountant (CPA), a Certified Fraud Examiner (CFE), and a Certified Anti-Money Laundering Specialist (CAMS). Prior to becoming a Special Agent, I received a bachelor's degree in accounting in May 2001 and then briefly worked for a large public accounting firm in Chicago, Illinois. Subsequently, I received law enforcement training at the Federal Law Enforcement Training Center in Glynco,

1

Georgia, graduating in December 2001 from the Criminal Investigator Training Program and graduating in March 2002 from the Special Agent Basic Training Program.

3.      I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, federal felony offenses. Here, I am one of the case agents investigating the alleged bank fraud and wire fraud committed by Lovette Namatinga (hereinafter "Namatinga") in connection with funds fraudulently obtained from various businesses as set forth in detail below. A federal grand jury in the Central District of Illinois indicted Namatinga for these offenses on October 1, 2019.

4.      This affidavit is made in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at a premises owned, maintained, controlled, or operated by Facebook, Inc., a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the user ID. The search is for evidence and instrumentalities, which are described further in Attachment B, concerning Namatinga's bank fraud in violation of 18 U.S.C. § 1344 and wire fraud in violation of 18 U.S.C. § 1343.

5.      The statements contained in this affidavit are based, in part, on my own investigation, as well as on information provided to me by other law enforcement

2

officers, on information provided by other witnesses, and on my own experience,

training, and background as a Special Agent with both the Internal Revenue Service-

Criminal Investigation and the Federal Deposit Insurance Corporation-Office of

Inspector General. This affidavit is intended to show only that there is sufficient

probable cause for the requested warrant and does not set forth all of my knowledge, or

the knowledge of others, about this matter.

## FACTUAL BACKGROUND

### I.    Namatinga's Immigration and Employment

6.    On or about June 22, 2012, Namatinga, a Cameroonian citizen, came to the

United States on a Diversity Immigration Visa. Once immigrated to the United States, it

is unknown how Namatinga was employed in the early years. From 2016 until his

arrest in October 2019, the Maryland Department of Labor reported that Namatinga

was employed at Fawema Enterprises, a company that serves individuals with

disabilities. Since 2018, the Maryland Department of Labor also reported that

Namatinga was employed at L.I.F.E., Inc., a non-profit agency dedicated to helping

adults with special needs. In addition, from 2016 until 2018, the Maryland Department

of Labor reports that Namatinga worked at Dominion Resource Center, a non-profit

agency that provides opportunities for seniors and the mentally impaired.

### II.   Namatinga's Fraudulent Bank Activity Through Keiko San Products

A.    Keiko San Products Bank Accounts

7.    On or about October 27, 2018, Namatinga opened a business checking

account, with account number 3619691326, in the name of Keiko San Products

Alimenticious, LLC (Keiko), at a Wells Fargo Bank branch in Owings Mills, MD.

According to the signature card, Keiko is located at 130 Persimmon Circle,

Reisterstown, MD, and is purportedly owned by Namatinga and Abigail Dzanni

(Dzanni). According to the Maryland Department of Assessments & Taxation,

Namatinga is the registered agent of Keiko. The business industry of Keiko, as

described on the Wells Fargo signature card, is food production and car services.

8.      On October 7, 2019, a group of FDIC-OIG agents and I executed a series of

search warrants, including at 130 Persimmon Circle, Reistertown, MD — Keiko's

registered business address.  The premises was not a business address, but rather the

residence of individuals who do not know Namatinga.

9.      On or about September 10, 2018, approximately one month prior to the

opening of the Wells Fargo account, account number 1000245828461 was opened in the

name of Keiko at a SunTrust Bank branch in Owings Mills, MD. According to the

SunTrust Bank records, the Keiko mailing address is 25 Enchanted Hills Rd, Apt. 1,

Owings Mills, MD (differing from the address shown on the Wells Fargo records).

SunTrust Bank records initially indicated that the owner, and only person listed on the

initial signature card, was Sheriff A. Sofo (Sofo). On or about March 26, 2019, however,

Namatinga was added as an authorized signer on the account, while Sofo remained the

sole owner.

B.      <u>Attempted Fraudulent Transfer Through Fidelity Investments</u>

10.      On or about November 29, 2018, a male contacted Fidelity Investments

and purported to be a Fidelity customer. The caller was able to answer a series of

knowledge-based questions and ultimately requested a disbursement of $28,500 from the Fidelity customer's account. The caller requested that Fidelity send the check to Keiko and provided an address of 10913 Huntcliff Drive, Apt. 9, Owings Mills, MD[1]. The check was issued, subsequently endorsed by what appears to be Namatinga's signature, and on or about December 4, 2018, was deposited into the Keiko bank account at SunTrust Bank (8461). Fidelity eventually realized the transfer request was not conducted by the true customer and was able to stop payment on this check, even though the check had already been deposited into the Keiko account at SunTrust Bank (8461). I interviewed the true Fidelity customer and he confirmed that he did not authorize the transfer in question. Neither Fidelity nor SunTrust Bank suffered a loss due to this transaction.

     C.     <u>Fraudulent Transfers Through Municipal Trust and Savings Bank</u>

     11.     On or about February 26, 2019, Municipal Trust and Savings Bank (MTSB), which is located within the Central District of Illinois, received a series of emails from an individual who purported to be the secretary of one of their loan customers. The series of emails requested that MTSB mail a check in the amount of $37,650.40 to Keiko at 10913 Huntcliff Drive, Apt. 9, Owings Mills MD, which was also Namatinga's home address. The funds were drawn from the MTSB customer's line of credit and the check was mailed as requested. On or about February 27, 2019, this check was deposited into the aforementioned Keiko account at Wells Fargo (1326) and the

---

[1] On October 7, 2019 agents conducted a search warrant of this address and determined it to be the residence of Namatinga and Dzanni.

check appears to be endorsed by Namatinga. Wells Fargo video footage shows this transaction was conducted by an individual who appears to be Namatinga. On or about March 4, 2019, and March 7, 2019, funds in the amount of $2,000 and $1,000, respectively, were transferred from the Keiko account to a Wells Fargo checking account in the name of Namatinga (0993). On or about March 8, 2019, a withdrawal of $32,500 was made from the Keiko account at Wells Fargo (1326) and a corresponding Currency Transaction Report (CTR) confirms the withdrawal was made in cash. Wells Fargo video footage shows this transaction was conducted by an individual who appears to be Namatinga.

12.     On or about March 11, 2019, MTSB received a second series of emails from an individual who again purported to be the secretary of the same loan customer. This time, the emails requested that MTSB mail another check in the amount of $41,200.40 to Keiko. The funds were drawn from the MTSB customer's line of credit and the check was mailed to 10913 Huntcliff Drive, Apt. 9, Owings Mills MD. On or about March 13, 2019, this check was deposited into the Keiko account at Wells Fargo (1326) and the check appears to be endorsed by Namatinga. Wells Fargo video footage shows this transaction was conducted by an individual who appears to be Namatinga. On that same day, according to Immigration and Customs Enforcement (ICE) records, Namatinga flew to Germany (five days after withdrawing $32,500 in cash from the Keiko account at Wells Fargo as described in Paragraph 11). Namatinga subsequently traveled to Lagos, Nigeria, where it appears that he stayed until his return to the United States on or about March 22, 2019. While Namatinga was apparently in Nigeria, ATM

transactions were conducted through the Wells Fargo Keiko account (1326) at locations in Lagos, Nigeria. While Namatinga was outside the United States, an online transaction also was conducted on or about March 15, 2019, transferring $4,000 from the Keiko account at Wells Fargo (1326) to Namatinga's personal savings account at Wells Fargo (9263). In addition to traveling back to the United States on or about March 22, 2019, an online transaction of $36,000 was conducted on or about that same day, transferring funds from the Keiko account at Wells Fargo (1326) to Namatinga's personal Wells Fargo checking account (0993).

13.     On or about March 23, 2019, approximately one day after returning to the United States and approximately one day after conducting the $36,000 transfer from the Keiko account to his personal checking account (0993), Wells Fargo records show two withdrawals from the checking account (0993) were conducted at two separate Wells Fargo branches in the amounts of $20,000 and $15,000. These withdrawals occurred at approximately 9:44 a.m. and approximately 10:16 a.m. A corresponding Currency Transaction Report (CTR) confirms that these transactions were both cash withdrawals. Wells Fargo video footage shows these transactions were conducted by an individual who appears to be Namatinga. The video footage also shows what appears to be Namatinga wearing a backpack during the second withdrawal. On or about March 25, 2019, an online transaction was conducted transferring $3,000 from Namatinga's personal checking account at Wells Fargo (0993) to his personal savings account at Wells Fargo (9263).

14.     On or about March 25, 2019, MTSB received a third series of emails from an individual who again purported to be the secretary of the same loan customer. This time, the emails requested that MTSB mail a check in the amount of $40,506.70 to the same Keiko address. The funds were drawn from the MTSB customer's line of credit and the check was mailed. On or about March 26, 2019 the check, this time endorsed by what appears to be Sofo's signature, was deposited into the Keiko account at SunTrust Bank (8461). On or about that same day, as previously mentioned, Namatinga was added to the Keiko account at SunTrust Bank as an authorized signer. Numerous cash withdrawals were conducted from this account following the deposit of this MTSB check, as shown below[2]:

- On or about April 1, 2019:  $500 (ATM)

- On or about April 1, 2019:  $500 (ATM)

- On or about April 3, 2019:  $8,000 (Signature appears to be that of Sofo)

- On or about April 3, 2019:  $5,000 (Signature appears to be that of Sofo)

- On or about April 4, 2019:  $500 (ATM)

- On or about April 4, 2019:  $500 (ATM)

- On or about April 4, 2019:  $10,000 (Signature appears to be that of Sofo)

- On or about April 4, 2019:  $5,000 (Signature appears to be that of Sofo)

---

[2] It should be noted that in addition to the MTSB deposit of $40,506.70 on March 25, 2019, a deposit of $17,000 was deposited into the account on April 15, 2019, for a purported vehicle sale (according to the check's memo line). The check was drawn on a Discover account. The true owner of this Discover account was interviewed on February 20, 2020 and confirmed that she was a victim of theft.

- On or about April 5, 2019:  $500 (ATM)

- On or about April 5, 2019:  $500 (ATM)

- On or about April 5, 2019:  $6,500 (Signature appears to be that of Sofo)

- On or about April 8, 2019:  $500 (ATM)

- On or about April 8, 2019:  $500 (ATM)

- On or about April 17, 2019:  $700 (Signature appears to be that of Namatinga)

- On or about April 18, 2019:  $1,000 (Signature appears to be that of Namatinga)

- On or about April 22, 2019:  $2,000 (Signature appears to be that of Namatinga)

- On or about April 23, 2019:  $10,000 (Signature appears to be that of Namatinga)

- On or about April 23, 2019:  $4,000 (Signature appears to be that of Namatinga)

- On or about April 23, 2019:  $500 (ATM)

- On or about April 23, 2019:  $300 (ATM)

15.     On or about April 8, 2019, MTSB received a fourth series of emails from an individual who again purported to be the secretary of the same loan customer. This time, the emails asked for an update on the remaining balance within the customer's line of credit and requested that MTSB mail a check in the amount of $21,650.70 to the same Keiko address, which is Namatinga's home address. The funds were drawn from the MTSB customer's line of credit and the check was mailed. On or about April 9, 2019,

9

the check was deposited into the Keiko account at Wells Fargo (1326) and the check appears to be endorsed by Namatinga. Wells Fargo video footage on April 9, 2019, shows this deposit was conducted through the Wells Fargo drive-through lane by someone in a dark colored Toyota Corolla. On or about April 12, 2019, funds in the amount of $3,000 were transferred from the Keiko account at Wells Fargo (1326) to an individual Wells Fargo savings account in the name of Namatinga (9263). On or about April 18, 2019, Wells Fargo records indicate that a withdrawal in the amount of $10,000 was conducted from the Keiko account at Wells Fargo (1326). Wells Fargo video footage shows this transaction was conducted by an individual who appears to be Namatinga.

16.     On or about April 18, 2019, after MTSB realized that their customer had not made any of the draw requests described in Paragraphs 11 through 15 and recognized that it and the customer were victims of fraud[3]; MTSB placed a "stop payment" on the final check issued. MTSB reports a loss of approximately $141,000 and Wells Fargo reports a loss of approximately $14,000 as a result of these fraudulent transfers.

    D.    Fraudulent Transfers Through Anytickets.com

17.     Unrelated to the transactions discussed above, on or about January 16, 2019, an entity entitled Events BSB Company, LLC (d/b/a Anytickets.com), located in Houston, Texas, received an email similar to the emails received by MTSB. The email

---

[3] This investigation confirmed that neither the MTSB loan customer nor his secretary sent the emails requesting the loan advances. The MTSB loan customer operates a realty company in Santa Monica, California.

requested that the Anytickets.com Controller wire $23,955 to a JP Morgan Chase account in the name of Aida Knowles (Knowles). The funds were wired to the named account before it was realized that the email was fraudulent. On or about that same day, a cashier's check drawn from Knowles' JP Morgan Chase account was drafted in the amount of $16,768.50. On or about January 18, 2019, this check was deposited into the Keiko account at Wells Fargo (1326). According to police reports filed by Anytickets.com, the customer has suffered a loss of the entire $23,955 due to this fraud[4].

       E.     <u>Summary of Namatinga's Fraudulent Activity</u>

18.    From the October 2018 inception of the Keiko account at Wells Fargo (1326) until the final fraudulent deposit transacted in April 2019, approximately $158,077 was deposited into the Keiko account owned by Namatinga. Approximately $117,270 (or approximately 75 percent) of the total deposits were derived from fraudulent activity. Approximately $28,611 (or approximately 18 percent) of the total deposits consisted of cash deposits.[5]  Based on these facts, as well as my training and experience, it does not appear that normal business transactions were conducted through this business checking account, rather it primarily was used by Namatinga to process fraudulently obtained proceeds.

---

[4] Anytickets.com also reported a loss of $98,550 regarding a similar fraudulent email requesting a transfer to an entity called Huanyu Fu Trading Co. Limited in Hong Kong.

[5] According to Weis Market, a supermarket that offers money wire services, Namatinga conducted approximately 18 wire transfers totaling approximately $8,595.72 to various individuals located in Ghana and Cameroon between August 25, 2018, and December 1, 2018. According to Money Gram, he also conducted approximately 48 wire transfers totaling approximately $8,034 to various individuals located in Cameroon, Thailand, and Italy between January 2, 2017 and May 22, 2017.

19.     On October 1, 2019, a federal grand jury in Springfield, Illinois indicted Namatinga for four counts of bank fraud, in violation of 18 U.S.C. § 1344, and four counts of wire fraud, in violation of 18 U.S.C. § 1343, and a warrant was issued for his arrest.

20.     On October 7, 2019, following his arrest, I conducted an in custody interview of Namatinga at Dulles International Airport. The interview was recorded and at the start of the interview Namatinga was read his In-Custody Statement of Rights, commonly referred to as Miranda Warnings. During the interview, Namatinga claimed to have a Facebook account that he had closed sometime prior to the interview, which he purportedly used to conduct a car business through "OfferUp."

21.     Specifically, when asked about the February 26, 2019, MTSB check, Namatinga claimed that he received it in the mail from a guy, named "Johnson". Namatinga stated that he met Johnson online and that Johnson was in need of a car. Namatinga further stated that he did not supply Johnson a car, rather he was only "cashing it out" to supply it to the person. I believe when Namatinga made this statement, he was claiming that he cashed the check mailed to him by Johnson and provided the cash to a person other than Johnson. Namatinga further claimed to have met and communicated with Johnson via Facebook. Namatinga stated that he asked Johnson about the checks he was receiving in the name of the customer. According to Namatinga, Johnson indicated that the money came from a bank loan. Namatinga explained that in exchange for cashing these checks, he was allowed to keep a portion of the funds.

22.     Even though Namatinga claims to have closed his Facebook account sometime prior to the aforementioned interview, the account appears to have activity on October 7, 2019. Pursuant to a search warrant issued by the District of Maryland on October 7, 2019, I was able to search Namatinga's iPhone. This search located activity occurring within Namatinga's Facebook account on October 7, 2019, which is the same day he was interviewed and ultimately arrested.

23.     Within the iPhone seized pursuant to the warrant issued out of the District of Maryland, there are approximately 182 Facebook Messenger Chats. On each of these chats, one of the people communicating always is Philly Mills. In other words, there are various other non-constant individuals communicating with Philly Mills.  Though Philly Mills' account has no photograph, based on my training and experience, I believe that the constant person (Philly Mills) in each of these chats is the user of the phone, or in this case Namatinga.  By opening the chat strings, I could see that the Facebook User ID associated with Philly Mills was 100003008396377.

24.     Beginning on or about August 4, 2018, there is a Facebook Messenger Chat string contained within the iPhone between Juliet Bassey and Philly Mills. In one particular chat beginning on or about October 30, 2018, in response to Juliet Bassey providing the name "JULIANA BEA ESAW," the person identified as Philly Mills writes, "Tracking number: 006-172-137, amount: 15000frs, name: Lovette namatinga. Western union."  Philly Mills then sends another message stating, "Go to any express union to pick up".  The iPhone also contains a Facebook Messenger Chat string beginning on or about September 23, 2019, between Vanessa Ateshu and Philly Mills.

13

In response to Vanessa Ateshu asking "Who is this?" Philly Mills replies, "Wow, U don't even remember me rite… loll." Philly Mills then sends another message stating, "Well, this is Lovette."

25.     Based on the foregoing, your affiant alleges there is probable cause to believe that Namatinga has committed violations of Bank Fraud, in violation of Title 18, United States Code, Section 1344 and violations of Wire Fraud, in violation of Title 18, United States Code, Section 1343. Further, though no Facebook messages from "Johnson" were visible on Namatinga's iPhone, your affiant alleges based on statements made in Namatinga's in-custody interview that there is probable cause to believe that Namatinga's Facebook account was used to communicate about the fraud with co-conspirators.

## APPLICATION

26.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

27.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone

numbers, screen names, websites, and other personal identifiers. Facebook also assigns

a user identification number to each account.

28.      Facebook users may join one or more groups or networks to connect and

interact with other users who are members of the same group or network. Facebook

assigns a group identification number to each group. A Facebook user can also connect

directly with individual Facebook users by sending each user a "Friend Request."  If the

recipient of a "Friend Request" accepts the request, then the two users will become

"Friends" for purposes of Facebook and can exchange communications or view

information about each other. Each Facebook user's account includes a list of that user's

"Friends" and a "News Feed," which highlights information about the user's "Friends,"

such as profile changes, upcoming events, and birthdays.

29.      Facebook users can select different levels of privacy for the

communications and information associated with their Facebook accounts. By adjusting

these privacy settings, a Facebook user can make information available only to himself

or herself, to particular Facebook users, or to anyone with access to the Internet,

including people who are not Facebook users. A Facebook user can also create "lists" of

Facebook friends to facilitate the application of these privacy settings. Facebook

accounts also include other account settings that users can adjust to control, for

example, the types of notifications they receive from Facebook.

30.      Facebook users can create profiles that include photographs, lists of

personal interests, and other information. Facebook users can also post "status" updates

about their whereabouts and actions, as well as links to videos, photographs, articles,

and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

31.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

32.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that

allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

33.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

34.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

35.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

36.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

37.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

38.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

39.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

40.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

41.      Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

42.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following

information from the user's profile: profile contact information; News Feed

information; status updates; links to videos, photographs, articles, and other items;

Notes; Wall postings; friend lists, including the friends' Facebook user identification

numbers; groups and networks of which the user is a member, including the groups'

Facebook group identification numbers; future and past event postings; rejected

"Friend" requests; comments; gifts; pokes; tags; and information about the user's access

and use of Facebook applications.

43. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP

address. These logs may contain information about the actions taken by the user ID or

IP address on Facebook, including information about the type of action, the date and

time of the action, and the user ID and IP address associated with the action. For

example, if a user views a Facebook profile, that user's IP log would reflect the fact that

the user viewed the profile, and would show when and from what IP address the user

did so.

44. Social networking providers like Facebook typically retain additional

information about their users' accounts, such as information about the length of service

(including start date), the types of service utilized, and the means and source of any

payments associated with the service (including any credit card or bank account

number). In some cases, Facebook users may communicate directly with Facebook

about issues relating to their accounts, such as technical problems, billing inquiries, or

complaints from other users. Social networking providers like Facebook typically retain

records about such communications, including records of contacts between the user and

the provider's support services, as well as records of any actions taken by the provider

or user as a result of the communications.

45.     As explained herein, information stored in connection with a Facebook

account may provide crucial evidence of the "who, what, why, when, where, and how"

of the criminal conduct under investigation, thus enabling the United States to establish

and prove each element or alternatively, to exclude the innocent from further suspicion.

In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic

communications, and other data retained by Facebook, can indicate who has used or

controlled the Facebook account. This "user attribution" evidence is analogous to the

search for "indicia of occupancy" while executing a search warrant at a residence. For

example, profile contact information, private messaging logs, status updates, and

tagged photos (and the data associated with the foregoing, such as date and time) may

be evidence of who used or controlled the Facebook account at a relevant time. Further,

Facebook account activity can show how and when the account was accessed or used.

For example, as described herein, Facebook logs the Internet Protocol (IP) addresses

from which users access their accounts along with the time and date. By determining

the physical location associated with the logged IP addresses, investigators can

understand the chronological and geographic context of the account access and use

relating to the crime under investigation. Such information allows investigators to

understand the geographic and chronological context of Facebook access, use, and

events relating to the crime under investigation. Additionally, Facebook builds geo-

location into some of its services. Geo-location allows, for example, users to "tag" their

20

location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

46.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

47.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Attachment B.

48.     Based on the foregoing, I believe there is probable cause that within Facebook records, as more particularly described in Attachment A, which is attached hereto and specifically incorporated herein by reference, are items that constitute evidence of the commission of an offense in violation of Title 18, United States Code, Section 1344 (bank fraud) and Title 18, United States Code, Section 134 (wire fraud), that

are contraband and/or fruits of crime, and that are intended for use or have been used as the means of committing a criminal offense, will be found. Those items are more specifically described in Attachments A, which is attached hereto and specifically incorporated herein by reference.

49.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

FURTHER AFFIANT SAYETH NOT.

s/Jason P. Lebeau

_____
JASON P. LEBEAU
Special Agent, Federal Deposit
Insurance Corporation – Office of
Inspector General

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1 by electronic mail and telephone on _____ 6th day of _____ April _____, 2020.

s/Eric I. Long

_____
ERIC I. LONG
United States Magistrate Judge

22

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the **Facebook User ID 100003008396377 (Philly Mills)** that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

## Particular Things to be Seized

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.